FILED
FEB 12 2008

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | CR. 07-40083 |
| Plaintiff, | |
| | **REPORT AND RECOMMENDATION** |
| vs. | ( Motions to Suppress) |
| | (Docs. 56, 58, 59, 60, 64, and 66) |
| ESTEBAN RUIZ-CHAVEZ, | |
| VENANCIO CRUZ-GOMEZ, | |
| URIEL VARGAS, | |
| STEPHANIE MARIE BOWERS, | |
| Defendants. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

The Defendants have filed motions to suppress (Ruiz Chavez, Docs. 59 & 60; Cruz-Gomez, Doc. 56; Vargas, Docs. 58 & 66; Bowers, Doc. 64). Defendants Cruz-Gomez and Bowers request suppression of evidence obtained as a result of the search of the van. (Docs. 56 and 64). Defendant Vargas seeks suppression of the evidence obtained as a result of the search and also requests that all evidence of his identity be suppressed "pursuant to the illegal stop and detention." (Doc. 66). Defendant Ruiz-Chavez seeks suppression of the evidence obtained as a result of the search and also seeks suppression of statements he made during the traffic stop because no *Miranda* warnings were given by Trooper Bader. (Doc. 60, ¶ 3). [1]Evidentiary hearings were held on January 7 and January 11, 2008. All the Defendants were personally present at both hearings and were represented by their respective counsel at both hearings— David Alan Palmer, Manual DeCastro, Bill Delaney, and Aaron McGowan. The government was represented at both hearings by Assistant U.S. Attorney John Haak. South Dakota Highway Patrol Trooper Zac Bader was the only witness who testified.

---

[1]Defendant Ruiz-Chavez also asserts he was interviewed after his arrest and after receiving his *Miranda* warnings, but acknowledges the interview was terminated immediately when it became clear he did not understand the written waiver form. Doc. 60, ¶ 2. In his brief (Doc. 61, p. 4) he asserted he requested an attorney during questioning but none was provided (it is unclear whether he meant Trooper Bader's questioning). Mr. Ruiz-Chavez withdrew this claim before the hearing began on January 7, 2008.

Government's Exhibit 1 (DVD of the traffic stop) and Defendants' Exhibits A through F were received into evidence. All parties have submitted briefs.

During the course of the hearings Defendants raised the issue of selective enforcement of the traffic laws based on race. They issued a subpoena duces tecum to the South Dakota Highway Patrol. The South Dakota Highway Patrol moved to quash the subpoena. The United States supported the motion to quash the subpoena. Briefing was ordered and the evidentiary hearings were placed on hold pending the decision on the motion to quash. The motion to quash the subpoena has been granted by a separate Order. Because the motion to quash the subpoena has been granted there is no need for additional testimony addressing the issue of selective enforcement of the traffic laws based on race. The motion to quash the subpoena was granted because Defendants have failed to make a threshold showing that Trooper Bader targeted these Defendants based on race and have failed to make a threshold showing that they could prove a prima facie case of selective enforcement based on race even if the subpoenaed information was produced.

Based on careful consideration of the evidence produced at the hearings and the parties' written submissions the Court makes the following:

## RECOMMENDATION

It is respectfully recommended that Defendants' Motion to Suppress be **DENIED.**

## JURISDICTION

Defendants are charged in an Indictment with Conspiracy to Distribute and Possess With Intent to Distribute a Controlled Substance and Possession with Intent to Distribute a Controlled Substance in violation of 21 U.S.C. §§ 841(a)(1) and 846. The pending Motion to Suppress was referred to the Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and Judge Piersol's Standing Order dated November 29, 2006.

## **FACTUAL BACKGROUND**

South Dakota Highway Patrol Officer Zac Bader and his drug dog Robby[2] were on stationary patrol on July 27, 2007 at approximately 7:00 a.m. on Interstate 90 near exit 260. TR 7-8. Trooper Bader was parked on a median cross-over facing west, with the eastbound traffic coming toward him. TR 34-35. It was a clear, sunny July day. TR 94. Trooper Bader observed a rental van with Minnesota license plates traveling east. TR 8. Bader could tell it was a rental van because of the bar code sticker on the windshield. TR 37. Trooper Bader observed the driver had his arms "locked" on the steering wheel. TR 8. Trooper Bader referred to this as "white-knuckling." TR 108. Trooper Bader was unable to discern the driver's race, but could tell it was a non-white person with a dark complexion and dark hair–possibly Native American, Hispanic or Black. TR 107. As the van passed Trooper Bader, the driver turned his head and looked away from the Trooper. TR 8. Bader noticed the driver wore a nice collared shirt. Bader could only see one occupant in the van. TR 11. He thought it was odd that a single person would rent a van instead of a compact car. TR 11. Bader could see a third row seat, but it appeared the middle row seat had been removed or was reclined. TR 11-12. The van had tinted windows, but Bader could not see any luggage in it. TR 45. Although as of that time he had not observed any traffic violation, Bader decided to follow the van to mile marker 265 to see if he observed any traffic violations. TR 8, 121, 151.

Trooper Bader activated the camcorder inside his patrol car. TR 8. A copy of the DVD recording was marked as EX 1 and received into evidence at the suppression hearing.[3] As Trooper Bader followed the rental van, he observed that it approached another vehicle on the interstate and

---

[2]Robby and Officer Bader became certified as a drug detection team on January 18, 2007. TR 6-7.

[3]The recording continued from 6:58:21 until 6:58: 52. The tape is missing the time frame between 6:58:52 until 7:00:48. When the tape begins again at 7:00:48, the patrol car is in the passing lane, and the rental van is in the driving lane for a short time before it puts its blinker on and prepares to pass the other vehicle. EX 1. Trooper Bader could not explain the gap in the recording. TR 48. He could have shut it off, but he does not remember. TR 47-48. He testified, however, that he did not make any phone calls or communicate with anyone on the state radio during the time the camera was off. TR 49, 146. He does believe that he called in the rental van's registration. TR 49.

3

followed the second vehicle too closely. TR 10. The van was traveling 74 miles per hour in a 75 mile per hour zone. TR 14, 97. He used a stop-watch that is attached to the dash of his patrol car to time the distance between the vehicles and determined the rental van was following the second vehicle within .98 seconds. TR 10. Trooper Bader explained that at the distance the rental van was traveling behind the vehicle in front of it, any hazard in the roadway would have been impossible for the rental van to avoid because it was following the lead vehicle too closely and would not have time to react. TR 15. Before Trooper Bader could get another reading, the rental van activated its blinker to pass the other vehicle. TR 11.[4] Trooper Bader estimated the rental van was one or two car lengths behind the other vehicle when it pulled out to pass the lead vehicle. TR 12. There was no other traffic in the vicinity. TR 128. Trooper Bader activated his emergency lights to stop the rental van. TR 16.

The rental van stopped at approximately mile marker 265. TR 17. EX 1 at 7:02. Trooper Bader approached the passenger side of the van and observed a man sleeping on the third-row bench seat. TR 18. Two more people were lying on the floor. *Id.* Trooper Bader spoke with a female passenger who had been reclining in the front passenger seat and then the driver. *Id.* On his initial approach to the van, Trooper Bader observed a deodorizing spray in the front window of the van, and several food wrappers. He saw no luggage. TR 18. He asked the driver for a license and registration. *Id.* EX 1 at 7:03. The passenger opened the glove box, where Bader observed some dental hygiene items. *Id.* Dental hygiene items in the glove compartment are not consistent with the general motoring public. TR 19. Trooper Bader explained the van had a "lived in" look, but he did not detect the odor of any drugs or alcohol. TR 168. Bader received the rental agreement and the driver (Venanciao Cruz-Gomez') driver's license). Trooper Bader asked Mr. Cruz-Gomez to

---

[4]Trooper Bader's hearing testimony seems to be inconsistent with the DVD, although the DVD is difficult to discern well enough to be clearly understood. On the DVD, Trooper Bader's voice can be heard as the patrol car approaches behind the rental van. As the rental van approaches behind the other vehicle in the driving lane, Trooper Bader says, "I'm going to try to time it here. I didn't get a time on it. But this van was following too close before he turned in to pass it. Following a little too close here . . ." EX 1 at 7:01. Trooper Bader made no mention on the DVD of having obtained an earlier or first time with the stopwatch.

4

accompany him back to the patrol car. TR 19. Mr. Cruz-Gomez complied. TR 19,[5] EX 1 at 7:03.

Trooper Bader explained the reason for the traffic stop. TR 1, EX 1 at 7:04.. Mr. Cruz-Gomez apologized, and said he was tired. *Id.* Trooper Bader advised he would give Mr. Cruz-Gomez a warning ticket. TR 20, EX 1 at 7:04. Trooper Bader asked Mr. Cruz-Gomez about his travel plans. *Id.* Mr. Cruz-Gomez said he had been vacationing/visiting relatives in Salt Lake City. Mr. Cruz-Gomez told Trooper Bader that everyone in the vehicle except the American girl were cousins. TR 2, EX 1 at 7:05. The American girl was his cousin's friend. *Id,* EX 1 at 7:07. The group was vacationing because the American girl had just graduated. *Id.* Trooper Bader noticed that during their conversation, Mr. Cruz-Gomez often laughed inappropriately for no apparent reason. TR 20. When Trooper Bader asked what the group did in Salt Lake City, Mr. Cruz-Gomez said they watched "the games." *Id.* EX 1 at 7:06. Mr. Cruz Gomez was unclear what type of "games" he watched or where he watched them. TR 21, EX 1 at 7:06. Trooper Bader thought Mr. Cruz-Gomez was "overly nervous" and saw the artery in his neck pounding. TR 21.

As Trooper Bader was completing the warning ticket he observed that Mr. Cruz-Gomez was not listed as a permitted driver on the rental agreement. TR 21, 57-58, EX 1 at 7:10. Bader was aware that rental agencies require drivers to be listed on the rental agreements. TR 21. He asked the driver whether the person who rented the van was in the vehicle. *Id.* EX 1 at 7:05. Mr. Cruz-Gomez indicated his cousin, Esteban Chavez was one of the men lying in the back seat. *Id.* Trooper Bader told Mr. Cruz-Gomez he needed to go speak with Estaban about the rental agreement, and instructed Mr. Cruz-Gomez to remain in the patrol car. TR 21, EX 1 at 7:09-7:10. At the suppression hearing, Trooper Bader testified that he did not actually hand the warning ticket to Mr. Cruz-Gomez until much later at the jail. TR 58.[6]

---

[5]Trooper Bader testified that although Mr. Cruz-Gomez had difficulty with some words, communication between the two of them was "pretty good" and Mr. Cruz-Gomez never advised the Trooper that he (Cruz-Gomez) did not understand. TR 152.

[6]At a state proceeding, the Trooper testified that he "issued the warning" and then spoke to the driver about his destination, purpose for his trip, etc. TR 59-60.

Trooper Bader returned to the rental van. EX 1 at 7:10. He approached the passenger window and asked if Esteban was in the van. TR 21, EX 1 at 7:10. Esteban identified himself, and the Trooper asked him to exit the vehicle. TR 22, EX 1 at 7:10. Trooper Bader spoke with Mr. Chavez at the side of the road. TR 22.[7] Bader advised Mr. Chavez that Mr. Cruz-Gomez was not listed as a permitted driver on the rental agreement. *Id.* Mr. Chavez indicated he understood that he needed to drive the van. *Id.* Trooper Bader asked Mr .Chavez about the details of the trip. Chavez explained that he and the female passenger went to Salt Lake City to pick up the other three passengers because they had gotten into an accident. TR 22. Mr. Chavez mentioned nothing about going to visit family or friends, or going to see a game. TR 22. Trooper Bader observed that Mr. Chavez appeared very tired, like he had been driving long hours. TR 23. He also appeared very nervous. *Id.* The driver (Cruz-Gomez) had not mentioned an accident. *Id.* By this time, Trooper Bader thought the occupants of the van were trying to conceal something because their stories were conflicting. TR 22. Trooper Bader asked Mr. Chavez if there were any illegal drugs in the van, and Mr. Chavez said "no, we're good." TR 23, EX 1 at 7:13. Trooper Bader instructed Mr. Chavez to return to the van. *Id.*

Trooper Bader asked the female juvenile passenger to exit the van. TR 23, EX 1 at 7:13. She complied. *Id.* EX 1 at 7:14. She explained she was going to pick up her brother because he had been in an accident. TR 24. She did not, however, know where her brother was. *Id.* When Trooper Bader asked her if there was anything illegal in the car, she became visibly nervous and began to shake. *Id.* She took deep breaths and would not stop eating the crackers in her hand. *Id.* When Bader specifically asked if there were any drugs or narcotics in the car, the juvenile looked away and said "not that I know of." EX 1 at 7:14. This is an unusual response because usually people who do not have narcotics in their vehicle say "no." Trooper Bader also thought the juvenile's avoidance of eye contact was suspicious. TR 24.

---

[7]The majority of the conversation between Trooper Bader and Mr. Ruiz-Chavez (or any other conversation that occurred outside the patrol car) is mostly unintelligible because Trooper Bader's remote microphone was not functioning properly.

Trooper Bader returned to the patrol car and retrieved Robby. TR 24, EX 1 at 7:14. Robby conducted an exterior sniff of the rental van. *Id.* He was "in odor" at the passenger rear side of the vehicle. *Id.* Trooper Bader explained that he could tell Robby was interested in that portion of the van because Robby's breathing became very intense. TR 25. They continued around the van, but Robby was not interested in the front of the van. TR 26. Trooper Bader continued around the van and returned to the back, where Robby again became very intense near the rear of the van. *Id.* Ultimately Robby sat to indicate the odor of drugs near the bottom door seam. TR 26, EX 1 at 7:15. Trooper Bader gave Robby his "cheat reward" and returned him to the patrol car. TR 27, EX 1 at 7:15. As Trooper Bader praised Robby while returning him to the patrol car, Mr. Cruz-Gomez (who remained inside the patrol car during the dog sniff) can be heard on the patrol car's internal microphone sighing and then saying very softly under his breath, "shit." TR 28, EX 1 at 7:16

.

Trooper Bader advised Mr. Cruz-Gomez that Robby indicated to the odor of drugs in the van and that the van would be searched. TR 28, EX 1 at 7:16. Trooper Bader called for back-up, and asked the remaining occupants of the van to exit the vehicle. *Id.*, EX 1 at 7:18. He pat-searched each one and asked them to sit in the ditch. TR 28, EX 1 at 7:20. Trooper Bader started his search near the place where Robby indicated. *Id.*, EX 1 at 7:21. There he found a blue duffel bag in front of the third row bench seat by the passenger rear door. He unzipped the bag and found ten individually duct tape wrapped packages, approximately one pound each. TR 29-30, EX 1 at 7:23. The packages tested positive for methamphetamine. TR 30.

Trooper Bader explained that the fact the van was a rental did not in itself raise his suspicion. TR 40. He did believe it was suspicious that the driver was wearing a dress shirt. *Id.* He explained he thought the dress shirt was suspicious because usually when people are traveling some distance they dress comfortably. TR 99. A common indicator of criminal activity is the person will dress in business attire to try to make law enforcement personnel believe they are traveling on business. TR 100. He also thought it was suspicious that the driver's elbows were locked because that is not a very comfortable way to drive any length of time. TR 41. Trooper Bader also found it suspicious that the driver of the van looked away from him. TR 42. He also noticed there was no visible luggage in the van. TR 45-47. He described these things as a "snapshot" as the vehicle drove past.

TR 142. He also found the conflicting stories about the travelers' reasons for the trip suspicious, as well as the passenger's answer regarding whether there were illegal substances in the van. TR 66-67. Trooper Bader explained that no one indicator pointed to criminal activity, but taken together, the conduct of the people in the van was not consistent with the general motoring public. TR 67. All of the indicators were consistent with criminal activity, but he was not sure the criminal activity was drug related until his dog indicated as much. *Id.* Trooper Bader emphasized that none of these indicators alone was necessarily suspicious. TR 116.

## DISCUSSION

### Burden of Proof

As a general rule, the burden of proof is on the defendant who seeks to suppress evidence, *United States v. Phillips*, 540 F.2d 319 (8th Cir.1976) but on the government to justify a warrantless search or seizure. *United States v. Bruton*, 647 F.2d 818 (8th Cir.1981). The standard of proof is a preponderance of the evidence. *Lego v. Twomey*, 404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972).

### The Validity of the Traffic Stop

Defendants argue the initial traffic stop was pretextual and without probable cause. While Defendants do not seriously dispute the rental van was traveling within one second of the vehicle in front of it,[8] they argue that this is not a violation South Dakota law. Defendants further claim the real reason Trooper Bader pulled them over was to investigate potential illegal drug activities,

---

[8]Defendants dispute that Trooper Bader used a stopwatch to make this calculation based on his failure to so testify until the suppression hearing. They do not argue, however, that the van was not actually within one second of the other vehicle. Bader did note the violation both in his report at page 1 (EX E) where he said "and was about a second behind the other vehicle before passing it . . ." and when he explained the reason for the stop to Mr. Cruz-Gomez in the patrol car on EX 1. He did not, however, mention the use of the stopwatch. Mr. Cruz-Gomez did not dispute the violation, and apologized. Although Trooper Bader's testimony about the use of the stopwatch is questionable, his claim that the van was following to closely has been consistent, and the traffic violation itself is documented on EX 1.

8

based on "racial profiling."

> SDCL § 36-26-40 states:
>
> 32-26-40. Following Too Closely-Violation as misdemeanor. The driver of a motor vehicle may not follow another vehicle more closely than is reasonable and prudent, having due regard for the speed of such vehicles and the traffic upon and condition of the highway. A violation of this section is a Class 2 misdemeanor.

The Eighth Circuit has stated that following less than two seconds behind the vehicle ahead constitutes following too closely. *U.S, v. Andrews*, 454 F.3d 919 (8th Cir. 2006). There is objective evidence in this case that the Defendants' vehicle was following within .98 seconds of the vehicle ahead of it at a speed of 74 miles per hour on an interstate highway. There was, therefore, probable cause to make the traffic stop. It is well settled that "when an officer observes a traffic offense–however minor–he has probable cause to stop a vehicle." *United States v. Eldridge*, 984 F.2d 943, 947 (8th Cir. 1993) (internal punctuation and citations omitted).

Even disregarding Trooper Bader's claim that he timed defendants' vehicle, the DVD reveals that the Defendants' vehicle followed within a few car lengths of the car it was trailing. It can be seen on the DVD that it was perhaps as close as one or two van lengths. It was certainly as close as four or five van lengths. The Eighth Circuit has said about a trailing vehicle traveling at 74 miles per hour: "[w]e also believe that an interval of 168 feet would have justified the police stop that occurred here. . . ." *Andrews* at 921. The length of five rental vans like the one Defendants were occupying is much less than 168 feet. Even disregarding the measure by time, the measure by distance indicates Defendants' vehicle was within a distance that the Eighth Circuit has indicated would justify a traffic stop for following too closely.

Pretextual traffic stops, however, violate the Fourth Amendment prohibition against unreasonable searches and seizures. *Id.* To determine whether a traffic stop is pretextual versus supported by probable cause, a court must assess the officer's action in light of the facts and circumstances known at the time of the stop. *Id.* However, "[c]ourts are not to consider the motive for a stop as long as the reason for the stop is valid." *United States v. Jones*, 275 F.3d 673, 680 (8th Cir. 2001)(citation omitted). "So long as the officer is doing nothing more than he is legally permitted and objectively authorized to do, his actual state of mind is irrelevant for purposes of

9

determining the lawfulness of the stop." *United States v. Pereira-Munoz*, 59 F.3d 788, 791 (8th Cir. 1995) (citations omitted). "In other words, so long as police have probable cause to believe that a traffic violation has occurred, the stop is valid *even if the police would have ignored the traffic violation but for their suspicion that greater crimes are afoot.*" *United States v. Caldwell*, 97 F.3d 1063, 1067 (8th Cir. 1996)(citations omitted) (emphasis added).

Defendants also claim (or at least suspect) they were the victims of "racial profiling." In *Whren v. United States*, 517 U.S. 806, 116 S.Ct. 1769, 135 L.E.d2d 89 (1996) the United States Supreme Court made clear that the actual motivation of the individual officer involved has no bearing on the constitutional reasonableness of traffic stops. *Id.*, 517 U.S. at 813, 116 S.Ct. at 1774. The *Whren* Court also noted, however, that "the Constitution prohibits selective enforcement of the law based on considerations such as race. But the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis." Id., 517 U.S. at 813, 116 S.Ct. at 1774. One court has noted that *Whren* left unclear whether suppression is the appropriate remedy should an Equal Protection violation be shown. *United States v. Garcia*, 1999 WL 318363 (D. Kan. 1999). Another has taken the position that suppression is the appropriate remedy. *United States v. Hartwell*, 67 F.Supp.2d 784 (E.D. Mich. 1999). However, that issue need not be reached here, because "[t]o establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *United States v. Armstrong*, 517 U.S. 456, 465, 116 S.Ct. 1480, 1487, 134 L.Ed.2d 687 (1996).

As explained in the Order Granting the Motions to Quash, the Defendants have offered no evidence in support of their racial profiling claim. They *suggest*, because all the trooper knew when he turned around and decided to follow their vehicle was that the driver was non-white, was driving a rental vehicle, was "white-knuckling" it and wore a dress shirt, that racial profiling occurred when Trooper Bader decided to stop them following too closely. However, this suggestion falls far short of a showing that "similarly situated individuals of a different race" were not stopped for following too closely. None of the information they sought through their subpoena would have furthered that cause.

10

Constrained by these legal precepts, I must find the initial stop was not pretextual. Defendant Cruz-Gomez apologized and offered an explanation for the incident when Trooper Bader explained the reason for the traffic stop. Given this state of facts, there was probable cause to make the traffic stop and investigate further into the possible violation of SDCL § 32-26-40.

The equal protection clause protects a person from becoming a target solely on the basis of skin color. *United States v. Avery*, 137 F.3d 343 (6th Cir. 1997). Trooper Bader adamantly testified that he does not target people for drug investigations solely based on any one characteristic, including race, because to do so would be counterproductive to his goal of catching drug offenders.

### The Scope of the Traffic Stop

"First, a police officer who personally observes a traffic violation has probable cause to stop the vehicle and offending driver . . . Second, having made a valid traffic stop, the police officer may detain the offending motorist while the officer completes a number of routine but somewhat time-consuming tasks related to the traffic violation, such as computerized checks of the vehicle's registration and the driver's license and criminal history, and the writing up of a citation or warning. During this process, the officer may ask the motorist routine questions such as his destination, the purpose of the trip, or whether the officer may search the vehicle, and he may act on whatever information is volunteered." *United States v. $404,905 in U.S. Currency*, 182 F.3d 643, 646 (8th Cir. 1999). The officer is entitled to "undertake similar questioning of the vehicle's occupants to verify the information provided by the driver . . . if the responses of the detainee and the circumstances give rise to suspicions unrelated to the traffic offense, an officer may broaden his inquiry and satisfy those suspicions." *United States v. Gregory*, 302 F.3d 805, 809 (8th Cir. 2002) (citations and internal punctuation omitted).

Whether an officer has reasonable suspicion to expand the scope of a traffic stop is determined by examining the totality of the circumstances, in light of the officer's experience. *U.S. v. Morgan*, 270 F.3d 625, 630 (8th Cir. 2001). "Though each factor giving rise to suspicion might appear to be innocent when viewed alone, a combination of factors may warrant further investigation

11

when viewed in total." *Id.* at 631 (citations omitted). In *Morgan* the factors articulated by the trooper (who had eleven years of experience, seven as a drug dog handler) were: the intense smell of smoke, perfume and air freshener, extreme nervousness by the driver and passenger exhibited by avoidance of eye contact, an itinerary which included drug source and demand states, large duffel bags which appeared to contain square objects, and divergent stories regarding travel plans. The Court held that the totality of the circumstances, including the officer's training and experience in detecting contraband, were sufficient to constitute reasonable suspicion to expand the scope of the traffic stop. *Id.* at 631.

The totality of the circumstances is similar here: air freshener was present in the front window well, the driver seemed excessively nervousness exhibited by his pounding artery and inappropriate laughter, his passengers were also excessively nervous exhibited by avoidance of eye contact and constant eating crackers while being interviewed. Here there were additional circumstances as well: the person driving the van was not listed as a permitted driver on the rental agreement, and divergent stories from the driver and the passengers regarding the reason for their trip and other historical details. Given the totality of the circumstances, Trooper Bader had enough reasonable suspicion to expand the scope of the traffic stop.

More importantly, however, "even if the facts had not been sufficient for reasonable suspicion . . . a short detention for a dog sniff would not violate the Fourth Amendment. Here, the dog was at the scene from the beginning, and it only took a short time to walk the dog over to the van where it alerted to the presence of drugs." *Morgan,* 270 F.3d at 631. In this case, Robby was on the scene from the beginning and Trooper Bader ran Robby around the van only twelve minutes after it stopped on the side of the interstate (Robby alerted twelve minutes after Trooper Bader first made contact with Mr. Cruz-Gomez). While Trooper Bader may have already written the warning ticket when Robby came out, Bader had not finished the traffic stop because he had not yet confirmed who was going to drive the van from the scene (because Mr. Cruz-Gomez was not an authorized driver pursuant to the rental agreement) nor had he given Mr. Gomez the warning ticket.

The United States Supreme Court has held that no reasonable articulable suspicion is required to justify the use of a drug dog to sniff a vehicle during a legitimate traffic stop. *Illinois v. Caballes*, 125 S.Ct. 834 (2005). "The use of a well-trained narcotics detection dog –one that does not expose non-contraband items that would otherwise remain hidden from public view during a lawful traffic stop, generally does not implicate legitimate privacy interests. In this case, the dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation. Any intrusion on respondent's privacy expectations does not rise to the level of constitutionally cognizable infringement." *Id.* at 838. Pursuant to the law of the Eighth Circuit and the United States Supreme Court, the traffic stop was not impermissibly extended in this case when, twelve minutes after it began and before Trooper Bader had finished his routine ministerial tasks, Robby got out of the patrol car and ran around the van to sniff for drugs.

Whether a particular detention is reasonable in length "is a fact intensive question, and there is no *per se* time limit on all traffic stops. When there are complications in carrying out the traffic-related purposes of the stop, for example, police may reasonably detain a driver for a longer duration than when a stop is strictly routine." *United States v. Olivera-Mendez*, 484 F.3d 505, 510 (8th Cir. 2007).

Even assuming Trooper Bader did not have reasonable suspicion (which he did) the Eighth Circuit stated that "mere police questioning does not constitute a seizure." *Olivera-Mendez, Id.* at 510. In *Olivera-Mendez*, the Court reiterated that questioning on a matter unrelated to the purpose of the detention does not constitute a discrete Fourth Amendment event. *Id.* In *Olivera -Mendez*, the Court noted the Trooper had probable cause to believe a speeding violation had occurred, and "we do not think [he] effected an unreasonable seizure simply by asking three brief questions related to possible drug trafficking amidst his other traffic related inquiries and tasks." *Id.* at 511. The same can be said for Trooper Bader's drug-related questions in this case.[9]

---

[9] The *Olivera-Mendez* Court also noted that assuming for the sake of argument that it was unreasonable for the Trooper to extend the stop unless he had reasonable suspicion, the evidence should nonetheless not be suppressed because the questions were not the but-for cause of obtaining the evidence. The Court reasoned that in that case, the questions were fruitless, and

13

Trooper Bader did not impermissibly extend the traffic stop. The rental van came to a stop at the side of the road at 7:02. At 7:03 Mr. Cruz-Gomez accompanied Trooper Bader to the patrol car, where Bader asked the routine, acceptable questions regarding the purpose and destination of the trip. Although there were no particular complications regarding Mr. Cruz-Gomez's license, there was a problem with the rental agreement because Mr. Cruz-Gomez was not a permitted driver. Bader then returned to the rental van to identify the renter (permitted driver) and ask the passengers the "routine" questions regarding destination and purpose for the trip. Their answers were inconsistent with Mr. Cruz-Gomez's answers. The handful of questions Trooper Bader asked each person about drugs did not significantly delay the stop, and their answers, combined with his earlier observations, provided him with reasonable suspicion to expand the scope of the stop. Robby the drug dog ran around the vehicle at 7:14 and alerted at 7:15–twelve minutes after Trooper Bader's first contact with the driver. Pursuant to *Olivera-Mendez* no unreasonable seizure occurred here.

### Identity Evidence–Vargas

In addition to the evidence obtained as a result of the search, Defendant Vargas moves to suppress all evidence relating to his identity obtained during the traffic stop. The basis for his motion (that the scope of the initial detention was impermissibly expanded) fails for the reasons already explained. It was also emphasized by defense counsel at various points in the suppression hearing that the occupants of the rental van were not free to leave during the traffic stop. That, however, is insufficient to amount to a custodial interrogation which requires suppression in the absence of *Miranda* warnings. The Eighth Circuit reviewed the principles of custodial versus non-custodial interrogation in the context of a traffic stop in *United States v. Pelayo-Ruelas*, 345 F.3d 589 (8th Cir. 2003):

---

the dog sniff (which provided probable cause for the search) would have occurred anyway while Koltz ran the driver's license checks. In this case, the questions were likewise fruitless. It is unclear, however, whether Trooper Bader had any license checks or other tasks to complete other than securing an authorized driver for the van and giving Mr. Cruz-Gomez the warning ticket. Trooper Bader explicitly testified, however, that he had not yet given Mr. Cruz-Gomez the warning ticket before Robby was deployed.

> The *Terry* stop and inquiry must be reasonably related in scope to the justification for their initiation. Typically, this means that the officer may ask the detainee a moderate number of questions to determine his identity and to try to obtain information confirming or dispelling the officer's suspicions. But the detainee is not obliged to respond. And, unless the detainee's answers provide the officer with probable cause to arrest him, he must then be released. The comparatively nonthreatening character of detentions of this sort explains the absence of any suggestion in our opinions that *Terry* stops are subject to the dictates of *Miranda*. The similarly noncoercive aspect of ordinary traffic stops prompts us to hold that persons temporarily detained pursuant to such stops are not 'in custody' for purposes of *Miranda*.

*Id.* at 592, *quoting Berkemer v. McCarty*, 468 U.S. 420, 439-40, 104 S.Ct. 3138, 82 L.Ed. 317 (1984). The Eighth Circuit rejected the "broad contention that a person is in custody for *Miranda* purposes whenever a reasonable person would not feel free to leave. One is not free to leave a *Terry* stop until the completion of a reasonably brief investigation, which may include limited questioning. But most *Terry* stops do not trigger the detainee's *Miranda* rights." *Pelayo-Ruelas,* 345 F.3d at 592. In that case, the Eighth Circuit held that the defendant was not subjected to restraints comparable to formal arrest at any time until he was actually placed under arrest–even though he admitted he was an illegal alien to a federal agent almost immediately after he was stopped. The defendant argued that a reasonable person in his circumstances would have believed he was "in custody" after making such an admission. The Court, however, found that despite his admission, "at no point during the "short period of time between the stop and the arrest" was the defendant informed his detention would not be temporary and that "a single officer asked him a modest number of questions at a location visible to passing motorists. "Treatment of this sort cannot fairly be characterized as the functional equivalent of formal arrest." *Id.* at 593.

"It is well-settled that routine biographical data is exempted from *Miranda's* coverage... A request for routine information necessary for basic identification purposes is not interrogation under *Miranda*, even if information turns out to be incriminating. Only if the government agent should reasonably be aware that the information sought, while merely for basic identification purposes in the usual case, is directly relevant to the substantive offense charged, will the question be subject to scrutiny." *United States v. Brown*, 101 F.3d 1272, 1274 (8th Cir. 1996) (citations omitted). Here, information regarding Defendant Vargas' identity was among the basic routine

15

questions Trooper Bader was allowed to ask the passengers of the rental van and is not directly relevant to the substantive offense charged in this case. It should not, therefore, be suppressed.

### Statements–Ruiz-Chavez

Finally, Defendant Ruiz-Chavez moves to suppress the statements he made during the traffic stop because no *Miranda* warnings were given by Trooper Bader. Again, defense counsel emphasized several times during the suppression hearing that the occupants of the rental van were not free to leave during the traffic stop. That Mr. Ruiz-Chavez was not free or did not fee free to leave, however " cannot fairly be characterized as the functional equivalent of formal arrest." *Pelayo-Ruelas,* 345 F.3d at 593. Mr. Ruiz-Chavez's pre-arrest statements made during the traffic stop, therefore, should be admissible.[10]

## CONCLUSION

For the reasons more fully explained above, it is respectfully RECOMMENDED to the District Court that the Defendants' Motions to Suppress (Docs. 56, 58, 59, 60, 64, and 66) be DENIED.

## NOTICE TO PARTIES

The parties have ten (10) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained. Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.

Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).
Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

Dated this  day of February, 2008.

---

[10]It is the Court's understanding that post-arrest statements are not at issue because Mr. Ruiz-Chavez received *Miranda* warnings before he was interviewed, which he stated he did not understand, and then the interview was terminated.

BY THE COURT:

_____
John E. Simko
United States Magistrate Judge

ATTEST:
JOSEPH HAAS, Clerk

By _____, Deputy

(SEAL)